In the
United States Court of Appeals
For the Eighth Circuit

No. 23-2432

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MARQUES DWELL ARMSTRONG, JR.,

Defendant-Appellant.

Appeal from the United States District Court
for the District of Minnesota

BRIEF OF DEFENDANT-APPELLANT

MANNY K. ATWAL
First Assistant Federal Defender
ERIC RIENSCHE
Assistant Federal Defender
District of Minnesota
U.S. Courthouse, Suite 107
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5858

*Counsel for Defendant-Appellant*

# SUMMARY OF THE CASE

This is an appeal from a criminal conviction for unlawful-firearm-possession offenses, following a jury trial and guilty verdict. Two issues are presented:

1.    Law enforcement had arranged a large-scale surprise operation to arrest Mr. Armstrong, and the startling approach prompted him to briefly flee before arrest. The charged firearm was discovered in foliage outside a multi-unit residential building, along the approximate path by which he had traveled. However, none of the many officers saw him possess or jettison any firearm during the brief travel, and there was no scientific identification evidence. The government presented a purely circumstantial case, based upon mere proximity. Such a presentation is insufficient with respect to the essential "possession" element of the charged offenses.

2.    The government was permitted to present uncharged other-acts evidence (OAE), in the form of a "rap video," purportedly depicting Mr. Armstrong performing lyrics referencing a firearm like the charged firearm, and displaying an "apparent firearm" of disclaimed authenticity. This "rap video" OAE was of miniscule (if any) probative value, and its risk of unfair prejudice was extremely high, such that OAE should have been excluded from trial.

The issues presented are both complex and fact-intensive, and oral argument would likely assist the Court in deciding these questions. Defendant-Appellant respectfully requests 15 minutes per side.

# TABLE OF CONTENTS

SUMMARY OF THE CASE.................................................................i

TABLE OF AUTHORITIES ...........................................................v

TABLE OF CITATIONS ...............................................................vii

JURISDICTIONAL STATEMENT .................................................1

STATEMENT OF THE ISSUES....................................................2

STATEMENT OF THE CASE.......................................................3

    A. Charged Offenses...............................................................3

    B. Pre-Arrest Investigation.....................................................4

    C. Arrest Operation ...............................................................6

    D. Discovery of Firearm.........................................................8

    E. Examination of Firearm....................................................12

    F. Other-Acts Evidence........................................................13

        1. Rap Video ...............................................................13

        2. Prior Conviction.......................................................15

    G. Circumstantial Theory .....................................................15

    H. Judgment of Conviction....................................................17

SUMMARY OF THE ARGUMENT ....................................................18

ARGUMENT ..............................................................................19

I.   The government's evidentiary presentation—consisting wholly of a circumstantial inference based upon mere proximity of Mr. Armstrong to the charged firearm—was insufficient to establish the essential element of Mr. Armstrong's possession of the charged firearm.
....................................................................................................19

   A. Standard of Review ...........................................................19

   B. Principles of Law ..............................................................20

      1. Sufficiency-of-Evidence Challenges ..................................20

      2. Circumstantial Presentations...........................................21

      3. Unlawful-Firearm-Possession Cases ..................................22

   C. Application to Instant Case .................................................24

      1. Mere-Proximity Thesis ..................................................24

      2. Absence of Supportive Evidence ......................................28

         (a). Flight Evidence..................................................29

         (b). Crossbody Satchel Evidence .................................30

         (c). 2088 Fry Landlord Evidence .................................31

         (d). "Rap Video" Evidence .......................................32

   D. Requested Relief ..............................................................34

II.   The "rap video" evidence—depicting Mr. Armstrong with an "apparent firearm" tucked in his waistband and offered under FRE 404(b) for the avowed purpose of establishing intent to possess the charged firearm—was of minimal probative value, vastly outweighed by the risk of unfair prejudice such that it should have been excluded under FRE 403. ................................................................................................35

       A.  Standard of Review ...................................................35

       B.  Principles of Law ......................................................36

            1. Other-Acts Evidence (OAE) ...............................36

            2. Rap Video OAE ...............................................38

       C.  Application to Instant Case .......................................39

       D.  Requested Relief .......................................................42

Conclusion ......................................................................43

Certificate of Compliance ................................................44

Certificate of Service .......................................................45

Addendum

# TABLE OF AUTHORITIES

**Cases**

*United States v. Brown,* 634 F.3d 435 (8th Cir. 2011) ............................22

*United States v. Chatmon,* 742 F.3d 350 (8th Cir. 2014) ........................20

*United States v. Chipps,* 410 F.3d 438 (8th Cir. 2005)............................29

*United States v. Cotton,* 823 F.3d 430 (8th Cir. 2016) ............................36

*United States v. Fawbush,* 634 F.3d 420 (8th Cir. 2011) ..................37, 42

*United States v. Fisher,* 965 F.3d 625 (8th Cir. 2020)..............................22

*United States v. Fortenberry,* 860 F.2d 628 (5th Cir. 1988) ............................ 37-38

*United States v. Gilbert*, 229 F.3d 15 (1st Cir. 2000)................................38

*United States v. Goodman,* 984 F.2d 235 (8th Cir. 1993) ........................34

*United States v. Hall,* 999 F.2d 1298 (8th Cir. 1993)..........................2, 21

*United States v. Harrison,* 70 F.4th 1094 (8th Cir. 2023) ........................40

*United States v. Huyck*, 849 F.3d 432 (8th Cir. 2017)..............................37

*United States v. May,* 476 F.3d 638 (8th Cir. 2007)................................20

*United States v. McCourt,* 468 F.3d 1088 (8th Cir. 2006)........................38

*United States v. Monds,* 945 F.3d 1049 (8th Cir. 2019) ..........................37

*United States v. Moore,* 639 F.3d 443 (8th Cir. 2011) ........................2, 38

*United States v. Owens,* 966 F.3d 700, 708 (8th Cir. 2020) ....................20

*United States v. Pace,* 922 F.2d 451 (8th Cir. 1990)................................21

*United States v. Parker,* 871 F.3d 590 (8th Cir. 2017)............... 2, 24, 27, 28, 30-33

*United States v. Perez,* 663 F.3d 387 (8th Cir. 2011)....................22, 23, 28

*United States v. Rea,* 300 F.3d 952 (8th Cir. 2002)..................................34

*United States v. Rembert,* 851 F.3d 836 (8th Cir. 2017) ..........................38

*United States v. Seals,* 915 F.3d 1203 (8th Cir. 2019)..............................21

*United States v. Street,* 548 F.3d 618 (8th Cir. 2008)...............................38

*United States v. Water,* 413 F.3d 812 (8th Cir. 2005) ..............................21

*United States v. White Plume,* 847 F.3d 624 (8th Cir. 2017) ...............2, 40

*United States v. Wiley,* 610 F.Supp.3d 440 (D. Conn. 2022) ...................39

**Statutes**

18 U.S.C. § 922 ..................................................................................3

18 U.S.C. § 924 ..................................................................................3

18 U.S.C. § 3231 ................................................................................1

28 U.S.C. § 1291 ................................................................................1

**Rules**

FRAP 4 ................................................................................................1

FRAP 32 ............................................................................................44

FRCrP 29 ....................................................................................19, 29

FRE 103 ............................................................................................36

FRE 401 ............................................................................................35

FRE 403 .......................................................... 2, 14, 35, 37, 38, 41, 42

FRE 404 .......................................................... 2, 13, 32, 33, 35, 36, 37

# TABLE OF CITATIONS

**Abbreviation**                                                          **Description**

Def. Add. ............................................... Addendum to Brief of Defendant-Appellant

FRAP ............................................................ Federal Rules of Appellate Procedure

FRE ................................................................................ Federal Rules of Evidence

FRCrP ............................................................ Federal Rules of Criminal Procedure

Gov. Ex. ........................................................................... Government Trial Exhibits

MIL Tr. ........... Transcript of 2.9.2023 Hearing on Motions in Limine (R. Doc. 169)

Mot. Tr. ............................... Transcript of 6.29.2022 Motions Hearing (R. Doc. 49)

Pretrial Tr. ........................... Transcript of 2.13.2023 Pretrial Hearing (R. Doc. 157)

R. Doc. ................. District Court Record Docket Entry (No. 21-cr-228 (D. Minn.))

R&R ........................................................ Report & Recommendation (R. Doc. 54)

Sent. Tr. .......................................... Transcript of Sentencing Hearing (R. Doc. 160)

SOC ................................................................... Statement of the Case of this Brief

Trial Tr. ...................... Transcript of Jury Trial (vol.#:pg.#) (R. Doc. 130, 131, 159)

# JURISDICTIONAL STATEMENT

Defendant-Appellant Marques Armstrong was charged by indictment filed in United States District Court for the District of Minnesota, No. 21-cr-228 ("district court") (docket entries cited herein as "R. Doc"). Criminal offenses against the United States were charged, (R. Doc. 1), triggering the district court's original jurisdiction, 18 U.S.C. § 3231.

The Honorable Elizabeth Cowan Wright, United States Magistrate Judge, presided over pretrial motions proceedings, (R. Doc. 29), including issuance of a report and recommendation (R&R), *inter alia* suggesting that Defendant-Appellant's pretrial motion to suppress be granted, (R. Doc. 54; Def. Add., at 8-58). The Honorable Donovan W. Frank, Senior United States Judge, issued an order adopting the R&R. (R. Doc. 62; Def. Add., at 59-64). And later presided over jury trial proceedings terminating in a guilty verdict, (R. Doc. 94, 96, 99, 100, 104), followed by an order denying a post-trial motion for judgment of acquittal, (R. Doc. 138; Def. Add., at 72-76).

After sentencing proceedings, (R. Doc. 146), the district court entered a judgment of conviction on June 6, 2023. (R. Doc. 147; Def. Add., at 1-7). A notice of appeal was filed on June 14, 2023, (R. Doc. 150), which is timely under FRAP 4(b)(1)(A)(i). This Court has jurisdiction to adjudicate the instant appeal under 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

This case involves federal offenses which include as an essential element the possession of a specified firearm at the time of defendant's arrest. However, none of the many law enforcement officers present during the arrest operation actually witnessed the accused in possession of the charged firearm, nor was forensic testing of the firearm indicative of any such possession. Rather, the government presented a wholly circumstantial case, premised upon mere proximity of the charged firearm to the defendant's travel path at the time of arrest. The issues presented here are:

## I.

Whether the government's evidentiary presentation was sufficient or insufficient to prove the essential element of possession of the charged firearm, where the government's case-in-chief was wholly circumstantial and based upon a mere-proximity thesis.

*United States v. Parker,* 871 F.3d 590 (8th Cir. 2017)
*United States v. Hall,* 999 F.2d 1298 (8th Cir. 1993)

## II.

In addition to the above, the government offered and was permitted to present uncharged other-acts-evidence (OAE) under FRE 404(b), including a "rap video" which purported to depict defendant with an "apparent firearm" and performing lyrics concerning weapons similar to the charged firearm. The issue is whether the "rap video" OAE ought to have been excluded under FRE 403, due to any probative value being substantially outweighed by the risk of unfair prejudice.

*United States v. White Plume,* 847 F.3d 624 (8th Cir. 2017)
*United States v. Moore,* 639 F.3d 443 (8th Cir. 2011)

# STATEMENT OF THE CASE[1]

The main focus of this Statement of the Case (SOC) concerns those portions of the district court record, (R. Doc.), which are particularly relevant to the issues presented to the Court as listed above. The pertinent factual background follows:

## A.    Charged Offenses

In this criminal prosecution, the government had charged Defendant-Appellant Marques Armstrong with two criminal offenses: (1) unlawful possession of a machine-gun, 18 U.S.C. § 922(o)(1) & § 924(a)(2); and (2) unlawful possession of a firearm by a person with a felony-level criminal history, 18 U.S.C. § 922(g)(1) & § 924(a)(2). (R. Doc. 1). Both charged counts were based upon the same purported incident, *i.e.,* the government alleged that on October 12, 2021, Mr. Armstrong had knowingly possessed a particular Glock pistol ("charged firearm"). (R. Doc. 1).

On that date, law enforcement had planned and executed a large operation aimed at placing Mr. Armstrong under arrest. (*E.g.,* R. Doc. 79, at 3-5 (factual recitation of government trial brief)). The basis for the action being state and federal probationary warrants, but as described below this was actually the culmination of a long-running investigation of Mr. Armstrong, who law enforcement suspected of "gang" affiliation and related firearm possession. (*E.g.,* id).

---

[1] Abbreviations contained within parenthetical citations to the record are described in the text, as well as within the Table of Citations above.

## B. Pre-Arrest Investigation

Pretrial proceedings revealed a "strategic intelligence" unit of the Minneapolis police department had long monitored Mr. Armstrong as a suspected member of criminal street gang, based upon a multi-point system of law enforcement's own creation, and premised upon how any given subject "is perceived by the community and presents themselves." (R. Doc. 49 (Transcript of 6.29.2022 Motions Hearing) ("Mot. Tr."), at 15-20). Purportedly in connection therewith, Mr. Armstrong previously had been convicted of a federal firearms-conspiracy offense in 2016, and then a state assault offense in 2019. (Mot. Tr., at 20-22). At the time of the October 12, 2021 arrest at issue here, Mr. Armstrong was under probationary status due to both prior convictions. (Mot. Tr., at 43-44).

State and federal probation officials had issued warrants for his arrest, in both cases based upon a claimed failure to maintain regular contact. (Mot. Tr., at 43-44). And it was these probation warrants that were ultimately offered as the legal justification for the October 12, 2021 arrest operation at issue here. (*E.g.,* 1:Trial Tr., at 42-44, 130-33).[2] However, these supposed probation infractions were not of significant concern to law enforcement; but rather the true impetus for the arrest operation was a report made by a confidential informant, claiming to have seen Mr.

---

[2] The transcript of jury trial proceedings occupies three (3) separate volumes. (R. Doc. 130 (vol. 1), 131 (vol. 2), 159 (vol. 3)). Herein, the specific volume is referenced in the format: (vol.):Trial Tr., at (page).

Armstrong in possession of a firearm and operating a red Jeep vehicle. (Mot. Tr., at 22, 36-37).

The above-referenced "strategic intelligence" unit suggested intensive monitoring and investigation of Mr. Armstrong, based upon the unconfirmed account of the informant and the above criminal history, but even more so recent "high-profile" incidents of gang violence in the Twin Cities metropolitan area, which were thought to raise the likelihood that Mr. Armstrong would be regularly carrying a firearm for self-protection from rival gang members. (Mot. Tr., at 23-26, 40-41).

At all events, in 2021 law enforcement came to believe or hope that Mr. Armstrong was in the habit of carrying a firearm for suspected gang-related purposes and operating a red Jeep. (Mot. Tr., at 11-42). And traced his likely residence to a multi-unit apartment complex (designated by the street address 1615 Eldridge, Roseville, Minnesota) where a vehicle meeting the above description was parked. (Mot. Tr., at 39-41; R. Doc. 79, at 2-3).

On October 12 of that year, law enforcement coordinated a large-scale operation seeking to arrest Mr. Armstrong based upon the above probation warrants, but in reality hoping to discover a firearm on his person for purposes of bringing federal charges like those at issue here. (Mot. Tr., at 39-41). Law enforcement did capture and arrest Mr. Armstrong on that date, and did discover a firearm in the vicinity of the arrest situs; however, no witness actually saw him possess or jettison

that firearm, hence requiring the government to make a purely circumstantial case-in-chief as described next.

## C.     Arrest Operation

At trial, the government offered the testimony of no less than five (5) law-enforcement witnesses, all directly involved in executing the October 12 arrest operation. (1:Trial Tr., at 2 (list of witnesses, the first four of whom were law-enforcement witnesses involved in arrest operation); 2:Trial Tr., at 274 (list of witnesses, last of whom meets same description)). The first was Sergeant Adam Lepinski of the Minneapolis police department, who described a coordinated effort to surveil the above-referenced 1615 Eldridge apartment building and red Jeep parked there, and conduct a stop-and-arrest action once Mr. Armstrong had exited the building and entered the vehicle. (1:Trial Tr., at 40-45). Specifically, to wait for Mr. Armstrong to back out of the parking spot while operating the red Jeep, and then conduct a surprise stop of that same vehicle. (1:Trial Tr., at 44).

The plan succeeded in some respects, but failed in others. For law enforcement did observe Mr. Armstrong exit the building and enter the red Jeep; and did take him unaware by converging upon his position with fast-moving vehicles. (1:Trial Tr., at 46-49). However, the sudden and aggressive law enforcement action was sufficiently alarming that Mr. Armstrong felt compelled to avoid it, by driving away at a high rate of speed. (1:Trial Tr., at 46-49).

The large contingent of officers gave chase, quickly finding the red Jeep crashed and in a disabled condition at the intersection of nearby streets Eldridge and Fry. (1:Trial Tr., at 50-51). Mr. Armstrong was no longer in the vehicle, however, but rather was spotted running through the front yards of residences situated along Fry. (1:Trial Tr., at 51-52). According to Sergeant Lapinski, Mr. Armstrong eventually veered in between two of those residences, through a wooded area, eventually reaching a street called Samuel. (1:Trial Tr., at 57-60, 102-03). It was near Samuel that law enforcement was able to overtake Mr. Armstrong, at which point he obeyed verbal commands to remain, and was placed under formal arrest. (1:Trial Tr., at 57-60). To illustrate the above-claimed chain of events and geographic relationships, the government offered a rendering:



(Gov. Ex. 1A; 2:Trial Tr., at 414-15).

Upon being subdued in the above place and manner, it was observed that Mr. Armstrong was wearing a "crossbody satchel," which was found partially unzipped. (1:Trial Tr., at 64-69, 91-92). At that time, law enforcement did not locate the charged firearm (or any firearm) within the satchel, nor on any part of Mr. Armstrong's person. (1:Trial Tr., at 86-94). Rather, the satchel contained only a computerized mobile telephone device ("smartphone") and a small quantity of contraband marijuana. (1:Trial Tr., at 80, 93). A second smartphone device was later recovered from the interior of the disabled Jeep vehicle. (1:Trial Tr., at 80).[3]

### D.    Discovery of Firearm

In trial testimony, Sergeant Lapinski conceded that he never witnessed Mr. Armstrong unzipping the satchel bag. (1:Trial Tr., at 90-91). Nor drawing any firearm from it. (1:Trial Tr., at 90-91). Nor dropping any firearm. (1:Trial Tr., at 94). Nor possessing any firearm. (1:Trial Tr., at 94).

---

[3] Law enforcement later applied for and obtained warrants to search the digital contents of these smartphone devices. (R. Doc. 54, at 3-7; Def. Add., at 10-14). However, the defense brought a motion to suppress any evidence obtained as a result of the resulting search-seizure actions, on the ground that the warrants were lacking as to the stated probable-cause nexus, as well as particularity of digitized items to be searched and seized. (R. Doc. 54, at 12-13; Def. Add., at 19-20). The district court ultimately sided with the defense in this regard, and ordered that evidence obtained as a result of these search-seizure actions be suppressed and excluded from trial presentations. (R. Doc. 62; Def. Add., at 59-64).

He was far from alone in this regard. As noted, this was a meticulously-planned arrest operation, directly involving numerous law enforcement officers. (SOC § C). A great many of whom directly witnessed the above chain of events, and testified about them at trial as follows:

| Witness | Direct Observations |
|---|---|
| Sgt. Russell Cragin | Observed Mr. Armstrong entering red Jeep and drive away at speed, and eventually observed above-referenced arrest at Samuel Street. (1:Trial Tr., at 104-24). |
| Lt. Jeffrey Waite | Observed red Jeep travel at speed and then crash at Eldridge-Fry intersection. Then observed Mr. Armstrong running along front yard areas of residences along Fry. (1:Trial Tr., at 130-43). |
| Ofc. Lindsey Kortus | Observed red Jeep, traveling at speed. (1:Trial Tr., at 162-66). |
| Sp. Agt. William Wethington | Observed Mr. Armstrong entering red Jeep and drive away at speed, then aftermath of arrest. (2:Trial Tr., at 393-400). |

And yet, every one of these law-enforcement witnesses who had carefully planned, participated in, and closely observed the arrest operation conceded to having never perceived any firearm in Mr. Armstrong's possession. (1:Trial Tr., at 127, 157-58, 182; 2:Trial Tr., at 432). No observations of Mr. Armstrong reaching into the crossbody satchel. (Id). Nor drawing a firearm from therein. (Id). Nor dropping a firearm. (Id). Nor holding a firearm. (Id).

Nonetheless, Sergeant Lapinski asserted the mere presence of the crossbody satchel was consistent with a recent "fad," possibly suggesting that Mr. Armstrong may have stowed a firearm at the outset of the above incident, and somehow jettisoned it at some point during the subsequent vehicular or pedestrian flight. (1:Trial Tr., at 70-73). Though he did concede, of course, that not *all* persons or suspects wearing such a bag had firearms secreted therein. (1:Trial Tr., at 88). And no mention was made of the above pre-arrest investigation, by which law enforcement had suspected all along that Mr. Armstrong was in the habit of carrying firearms, and hoped this would be the case at the time of this arrest. (SOC § B; Mot. Tr., at 11-42).

The truth is, consistent with the pre-arrest investigation and expectations, Sergeant Lapinski had formed a mere "belief" as to the possibility that Mr. Armstrong had recently possessed and then discarded a firearm. (1:Trial Tr., at 91). And it was this mere belief which prompted him to instruct fellow law enforcement officers to examine the estimated path along which Mr. Armstrong had just traveled, in search of the hoped-for but as-yet unseen firearm. (1:Trial Tr., at 72-74).

In any event, law enforcement did examine what was approximated to be the path Mr. Armstrong had recently traveled. (1:Trial Tr., at 145-46). In the course thereof, officers did discover a firearm, lying amongst a tall species of decorative

grass in the front yard of a multi-unit apartment building, designated as 2088 Fry and referenced on the above map. (1:Trial Tr., at 76, 147-48, 168-70; Gov. Ex. 1A).

Law-enforcement witness Lt. Waite, referenced earlier, testified to having witnessed Mr. Armstrong fall in that same tall decorative grass at 2088 Fry during his pedestrian flight, (1:Trial Tr., at 140-41), and to having discovered the firearm lying amongst the foliage at that same approximate spot, (1:Trial Tr., at 147-48). Though, he also conceded that he never saw Mr. Armstrong draw a firearm from his crossbody satchel, nor drop any firearm, nor possess any firearm. (1:Trial Tr., at 157-58). And according to his own account, Lt. Waite was in position to observe whether or not any such firearm possession or disposal had occurred:

Q. And did you keep your eyes on Mr. Armstrong?

A. Yes, I did.

Q. The entire time from when he starts running?

A. From every second that I could actually see him, I may have lost him briefly as I went around when I backed up to turn, I may have lost him for a step or two but, yes, that my focus was on him * * * .

Q. Okay. So you keep your eyes on him and you claim that he fell in the grass, correct?

A. Correct.

Q. Fell one time?

A. One time.

Q. And I think your words were, "He immediately got up." Is that right?

A. He did.

Q. He didn't try and shuffle around in the grass, he got up and ran again?

A. Not that I saw. He appeared to fall down and pop right back up.

Q. Okay. The entire time you had eyes on him, did you see an object in his hand?

A. I did not.

(1:Trial Tr., at 157).

At all events, law enforcement then proceeded to examine the firearm which had just been discovered at 2088 Fry, in the following manner.

### E. Examination of Firearm

Upon initial examination at the arrest situs, law enforcement judged the firearm was a Glock pistol, equipped with an extended magazine and "switch" device. (1:Trial Tr., at 79-80, 148-49, 154, 174-75). This last item was described as device which may convert a given firearm with semi-automatic functionality to fully-automatic functionality, *i.e.,* discharging multiple rounds of ammunition with a single pull of the trigger. (1:Trial Tr., at 79; 2:Trial Tr., at 341, 363-64). Much later, law enforcement delivered the firearm discovered at 2088 Fry to specialist examiners, who found that it was indeed capable of firing in a fully-automatic manner. (1:Trial Tr., at 209-13).

Law-enforcement witnesses described the firearm as clean and in good overall condition. (1:Trial Tr., at 237-38; 2:Trial Tr., at 347). Examiners tested the firearm for the presence latent fingerprints or DNA-infused biological material, but found the firearm to contain neither. (1:Trial Tr., at 241-50).

In sum, then, there was no direct evidence presented—in the form of witness observations or scientific testing—to suggest that Mr. Armstrong had possessed this firearm on the October 12 date of arrest or at any time, as had been charged. For this reason, at trial the government relied entirely upon uncharged other-acts evidence and wholly circumstantial proof, described in more detail next.

## F. Other-Acts Evidence

Over defense objection, the government offered and the district court permitted two primary categories of uncharged other-acts evidence (OAE) pursuant to FRE 404(b), as follows: (1) a rap-music video featuring Mr. Armstrong as lead singer; and (2) details of a 2016 conviction of a federal offense involving a conspiracy to make firearms available to prohibited persons. (R. Doc. 92, at 2, 5; Def. Add., at 66, 69).

### 1. Rap Video

As part of the "gang" evaluation of Mr. Armstrong which presaged the above law enforcement investigation and arrest operation, (*e.g.,* SOC § B), the same "strategic intelligence" law enforcement officer examined public social media

websites for posts by or involving Mr. Armstrong. (2:Trial Tr., at 373). From one such website, the officer had located and extracted a video file, depicting Mr. Armstrong as the lead singer of rap-music video. (2:Trial Tr., at 373, 376-77, 382; Gov. Ex. 34). Law enforcement was able to determine when the video was posted to the website, but not when the video was actually produced. (2:Trial Tr., at 430-31).

The contents were described as: "Mr. Armstrong rapping about a Glock and a switch." (2:Trial Tr., at 376-77, 427-28). It was also claimed that the video depicted "what appears to be a handgun with an extended magazine," tucked into the waistband of Mr. Armstrong. (2:Trial Tr., at 427). The claim was given special emphasis in a separate exhibit—a still frame extracted from the video, and by appearances showing Mr. Armstrong possessing a firearm similar to the charged firearm at issue. (2:Trial Tr., at 383; Gov. Ex. 35).

The defense had repeatedly objected to this category of OAE as of marginal probative value, far outweighed by high risk of unfair prejudice and hence to be excluded under FRE 403. (R. Doc. 74, at 10-11 (motion in limine); R. Doc. 169 (Transcript of 2.9.2023 Hearing on Motions in Limine) ("MIL Tr."), at 16-30; 2:Trial Tr., at 276, 382-83)). However, the objection was overruled, and the above testimony and video footage were admitted during jury trial proceedings. (R. Doc. 92, at 2; MIL Tr., at 26-28; 2:Trial Tr., at 382-83). And heavily relied-upon by the

government in its theory of the case, as evidenced by opening remarks and summation. (1:Trial Tr., at 34; 3:Trial Tr., at 500, 503).

### 2. Prior Conviction

Again over repeated defense objection, (R. Doc. 74, at 6-8; MIL Tr., at 54-63), the government offered and the district court permitted evidence that Mr. Armstrong had pled guilty in 2015 to a federal offense described as:

> That from 2010 to 2014, [Mr. Armstrong] and others agreed to obtain numerous firearms for known convicted felons who were prohibited from having firearms. He also agreed to use his residence to store those firearms and that he and others jointly possessed them.

(2:Trial Tr., at 425).

### G. Circumstantial Theory

Lacking direct evidence as to Mr. Armstrong's alleged possession of the charged firearm on the date of arrest—*e.g.,* observations of any of the many law enforcement officers present or scientific identification techniques like fingerprints or DNA—the government's theory of the case was reliant upon circumstantial inference. That is to say, based upon having been arrested while wearing a crossbody satchel which in prior law enforcement experience were sometimes used to carry firearms, and the discovery of the charged firearm in the tall decorative grass along the estimated route where Mr. Armstrong had recently traveled. (3:Trial Tr., at 495-96). The defense pointed out the above non-observations by any of the multiple officers present, as well as absence of scientific identification evidence. (3:Trial Tr.,

at 510-13). The government's rebuttal: if one observes snow in the morning, that is sufficient proof that it must have snowed the night before. (3:Trial Tr., at 523).

But the government was not left to rely upon meteorological analogy, due to the district court's allowance of the above OAE in the form of rap video and prior conviction. In both opening statements and summation, the government relied heavily upon both, *e.g.,*

> The defendant stated in that video, "Bsco upgraded my Glock. He said I got to switch you up." The defendant's references to "my Glock" and "switch" are not just coincidental, ladies and gentlemen. As the defendant says "my Glock" he lifts his shirt to reveal what appears to be a firearm with extended magazine, putting his words in context. The defendant's acts and words in the rap video show the defendant's knowing possession of the Glock model 26 with a full auto switch.

(3:Trial Tr., at 500; *accord* 1:Trial Tr., at 34; 3:Trial Tr., at 503-05).

Upon considering all of this, the jury returned guilty verdicts on both charged counts. (3:Trial Tr., at 575; R. Doc. 104). The defense filed a post-trial motion for judgment of acquittal, on the ground that the above non-observation by many law enforcement witnesses present and lack of scientific identification evidence meant the government's presentation could not meet the required beyond-a-reasonable doubt threshold. (R. Doc. 125, at 8). However, the district court denied the motion by written opinion and order. (R. Doc. 138; Def. Add., at 72-76).

## H. Judgment of Conviction

Following the jury verdict, the district court called upon its probation office to conduct pre-sentence investigation, (3:Trial Tr., at 577), ultimately resulting in a pre-sentence investigation report (PSR), (R. Doc. 140). The parties submitted objections to the PSR and took positions as to the appropriate sentence assuming validity of the jury verdict, (R. Doc. 143 & 144), and the district court considered all of the foregoing in arriving at a 127-month term of imprisonment, (Sent. Tr., at 47). Both the convictions and the sentence were entered as a final judgment, (R. Doc. 147; Def. Add., at 1-7), from which Defendant-Appellant Armstrong filed a timely notice of appeal, (R. Doc. 150). Mr. Armstrong now respectfully challenges the above convictions to this Court, for reasons that follow:

# SUMMARY OF THE ARGUMENT

This is an appeal from federal convictions for unlawful-firearm-possession offenses, following a jury trial and guilty verdicts. Two issues are presented:

1.     Law enforcement had arranged a large surprise operation to arrest the defendant Mr. Armstrong, and the startling approach prompted him to briefly flee before arrest. The charged firearm was discovered in the foliage outside a multi-unit residential building, along the approximate path by which he had recently traveled. However, none of the many officers present during the operation had observed him possess or jettison any firearm during the brief travel, and there was no scientific identification evidence either. The government presented a purely circumstantial case, based upon mere proximity of Mr. Armstrong's recent travel to the location where the charged firearm was ultimately discovered. However, such a mere-proximity presentation is insufficient with respect to the essential "possession" element of the charged offenses.

2.     The government was permitted to present uncharged other-acts evidence (OAE), in the form of a "rap video," purportedly depicting Mr. Armstrong performing lyrics referencing a firearm like the charged firearm, and displaying an "apparent firearm" of disclaimed authenticity. This "rap video" OAE was of miniscule (if any) probative value, and its risk of unfair prejudice was extremely high, such that OAE should have been excluded from trial.

# ARGUMENT

## I. The government's evidentiary presentation—consisting wholly of a circumstantial inference based upon mere proximity of Defendant Armstrong to the charged firearm—was insufficient to establish the essential element of defendant's possession of the charged firearm.

In this case, both charged offenses required as an essential element—and hence were required to be proved beyond a reasonable doubt—that Mr. Armstrong had possessed the charged firearm on October 12, 2021. (3:Trial Tr., at 548-50 (jury instructions as to elements of both charged offenses)). The government conceded that none of the many law enforcement officers present during the sophisticated arrest operation had actually seen Mr. Armstrong in possession of the charged firearm. (3:Trial Tr., at 523). Rather, the government relied solely upon evidence that the charged firearm had been discovered within an area of tall decorative grass, where it was estimated that Mr. Armstrong had recently traveled and fallen during pedestrian flight. (3:Trial Tr., at 494-98, 523-25). However, as explained below, the mere discovery of a firearm in an area where the defendant had recently been (*i.e.,* mere proximity) is insufficient to meet the essential element of firearm possession, under the applicable beyond-a-reasonable-doubt standard.

### A. Standard of Review

Before the district court, Mr. Armstrong brought a motion for judgment of acquittal at the close of the government's case-in-chief, under FRCrP 29(a). (2:Trial Tr., at 446-50). And under FRCrP 29(c), he brought another such motion after the

jury had returned its guilty verdicts. (R. Doc. 125). Both motions were based upon insufficiency of the government's evidence to meet the applicable beyond-a-reasonable-doubt standard with respect to a common element of both charged counts, *i.e.,* possession of the charged firearm. (2:Trial Tr., at 446-47; R. Doc. 125, at 3 (arguing "[t]he government failed to prove beyond a reasonable doubt that Mr. Armstrong possessed a firearm, an essential element of both count one and count two.")).

Where, as here, a defendant had brought a motion for judgment of acquittal based upon insufficiency of evidence as to any essential element of the charged offense, and then renews the same argument on appeal, the issue is preserved for this Court's full review. *United States v. May,* 476 F.3d 638, 640 (8th Cir. 2007). And in such circumstances, this Court "review[s] the denial of a motion for a judgment of acquittal based on the sufficiency of the evidence *de novo*." *United States v. Chatmon,* 742 F.3d 350, 352 (8th Cir. 2014).

## B.    Principles of Law

### 1.    Sufficiency-of-Evidence Challenges

In considering a sufficiency-of-evidence challenge as here, this Court considers the evidence presented at trial in a light most favorable to the verdict, and evaluates whether such evidence may reasonably satisfy the "elements of the offense beyond a reasonable doubt." *United States v. Owens,* 966 F.3d 700, 708 (8th Cir.

2020). However, this standard is subject to special caveats in the context of a wholly circumstantial case-in-chief, as explained next.

## 2. Circumstantial Presentations

A conviction may be based on circumstantial as well as direct evidence, and the evidence need not exclude every reasonable hypothesis other than guilt. *United States v. Seals,* 915 F.3d 1203, 1205 (8th Cir. 2019). "In determining the strength of the evidence in a circumstantial case, it is the totality of the circumstances that must be weighed in making a decision on a motion for acquittal." *United States v. Water,* 413 F.3d 812, 817 (8th Cir. 2005) (internal punctuation and citations omitted).

However, "[i]f the government's evidence is equally strong to infer innocence as to infer guilt, the verdict must be one of not guilty and the court has a duty to direct an acquittal." *Water,* 413 F.3d at 817 (internal punctuation and citations omitted). "While reasonable inferences from the evidence weigh against the defendant, speculation does not." *United States v. Pace,* 922 F.2d 451, 453 (8th Cir. 1990). Under these principles, this Court has recognized that a mere-proximity evidentiary presentation is insufficient to support a criminal conviction: "[P]hysical proximity to the commission of a crime * * * is simply insufficient to establish responsibility for it." *United States v. Hall,* 999 F.2d 1298, 1299 (8th Cir. 1993).

### 3. Unlawful-Firearm-Possession Cases

In unlawful-firearm-possession cases as here, the government has the option to prove either actual possession or constructive possession. *United States v. Brown,* 634 F.3d 435, 439 (8th Cir. 2011). Actual possession is the "knowing, direct, and physical control over a thing"; whereas constructive possession "is established by proof that the defendant had control over the place where the firearm was located, or control, ownership, or dominion of the firearm itself." *Id.* (internal punctuation and citations omitted). Either way, the government's case may be based upon circumstantial evidence, subject to the above limiting principles. *Id.*

That is to say, when the government presents a wholly circumstantial case-in-chief to prove the claimed firearm possession, "the factfinder may infer defendant had control of the firearm based on all the circumstances." *United States v. Perez,* 663 F.3d 387, 392 (8th Cir. 2011). But if the prosecution goes that route, it bears the burden to "show a sufficient nexus between the defendant and the firearm," and "mere physical proximity is insufficient" to do so. *Id.* (internal punctuation and citations omitted); *accord, e.g., United States v. Fisher,* 965 F.3d 625, 629-30 (8th Cir. 2020) ("In an illegal firearms case * * * [m]ere physical proximity is insufficient to prove constructive possession.") (citations and punctuation omitted).

Accordingly, this Court has affirmed an unlawful-firearm-possession conviction where a defendant fled from a drug-operation situs upon spotting law

enforcement, and a firearm was later located at that same situs; but crucially, the mere-proximity evidence was buttressed by, *e.g.,* the defendant's own admissions as to awareness of the presence of the firearm, and a co-defendant testified to having actually seen the defendant in possession of that very same firearm. *Perez,* 663 F.3d at 392-93.

But in accordance with the principle that mere-proximity evidence is insufficient to support a criminal conviction, this Court has vacated a conviction on sufficiency-of-evidence grounds, under circumstances that are strikingly similar to the case at hand:

> [L]aw enforcement executed a warrant for [Defendant's] arrest on a charge of violating supervised release. Officers observed [Defendant] retrieve an unidentified object from his own vehicle and then enter a vehicle driven by [a companion]. [Law enforcement] followed * * * and attempted to make a stop. [The vehicle] pulled into an apartment complex and stopped momentarily. Officers saw [Defendant] "bend over like he was reaching under the passenger seat." When the officers exited their vehicle, [the vehicle] rapidly sped away. The careening vehicle made a quick left turn and collided with an oncoming pickup truck. [The vehicle] continued before the officers stopped the car a few blocks away.
>
> * * *
>
> After the chase ended, a maintenance worker for the apartment complex arrived on scene and noticed a firearm. The firearm was located along the path traveled by the vehicle that [Defendant] occupied. * * * Forensic examination of the gun did not reveal any DNA or fingerprint evidence. None of the officers or other witnesses testified to seeing any activity from inside the vehicle to connect it to the weapon * * *.

*United States v. Parker,* 871 F.3d 590, 602 (8th Cir. 2017) (additional and less-relevant details omitted). In *Parker,* this Court properly rejected the government's contention that the jury could infer the defendant had possessed the firearm discovered "along the path traveled by the vehicle," because "[o]n these facts, assuming the firearm came from the vehicle at all is speculative." *Id.* at 602 & 604. As explained next, the case at hand is of a piece with this Court's *Parker* decision, and hence Mr. Armstrong respectfully requests the same result, *i.e.,* that the Court vacate the unlawful-firearm-possession convictions based upon mere "proximity," and hence "speculation."

## C.    Application to Instant Case

### 1.    Mere-Proximity Thesis

Here, spurred by an informant's report that Mr. Armstrong had been seen carrying a firearm,  law enforcement conducted an investigation into his criminal history and current social media postings to conclude that he may be engaged in ongoing "gang" activity. On this basis, law enforcement hoped and expected to apprehend him in possession of a firearm. It was this hypothesized gang membership—not the stated failure-to-maintain contact probation violations—which prompted law enforcement to arrange the sophisticated and large-scale arrest operation of October 12, 2021. (SOC § B).

A large number of law enforcement officers were thus in meticulously-planned position to arrest Mr. Armstrong near the 1615 Eldridge apartment building where he was thought to be staying, at least five (5) of whom testified at trial. All closely watching his every movement. And continuing to closely watch his every action, after he had been startled into vehicular flight from Eldridge and on foot along Fry. (SOC § C).

Hence, every one of these law-enforcement witnesses was in position and able to testify as to Mr. Armstrong's movements during the arrest operation of October 12. Including one who watched as he ran through the front yard areas of residences along Fry, and apparently tumbled in front of 2088 Fry. Yet none of these five law enforcement witnesses—including the officer who watched him fall—ever saw him reach into the crossbody satchel that he had been wearing. Nor pull the charged firearm from that bag. Nor drop the charged firearm. Nor possess the charged firearm at any time before or during the pre-arrest flight. (SOC § D).

Law enforcement did, however, make post-arrest discovery of the charged firearm nestled in the tall decorative grass found in the front yard of 2088 Fry, where one law-enforcement witness claimed Mr. Armstrong had fallen during the flight. Yet law enforcement could not and did not offer evidence as to the critical question of whether the charged firearm had been there all along. (SOC § D). Nor did law enforcement interview any tenants of the 2088 Fry residence, to determine whether

the charged firearm might have already been in the place where law enforcement discovered it, long before the arrest operation at issue here. (2:Trial Tr., at 429-30).

The charged firearm was later examined and tested, with the express aim of establishing that Mr. Armstrong had possessed the charged firearm at some point. Yet this too failed to bear the fruit that law enforcement hoped. The firearm was determined to be clean and in good condition, for instance bearing no signs of residue that might be expected if it had been recently pulled from a bag containing loose marijuana cigarillos, as had been discovered in the crossbody satchel that Mr. Armstrong had been wearing at the time of arrest. Nor latent fingerprints claimed to match those of Mr. Armstrong's person. Nor trace biological material claimed to match the DNA profile of Mr. Armstrong's person. No scientific identifying information at all. (SOC § E).

In short, the government's case-in-chief was notable for presenting no direct evidence that Mr. Armstrong had ever possessed the charged firearm, be it witness observation or scientific identification techniques. Rather, the government expressly relied upon a wholly circumstantial thesis based upon mere proximity, *i.e.,* discovery of the charged firearm in the tall grass near 2088 Fry, with Mr. Armstrong's recent travel along a path that included that same place-of-discovery. This is demonstrated by the government's closing remarks, which rely solely and expressly upon a mere-proximity theory of the case, *e.g.,*

| Mere-Proximity Thesis | R. Doc. |
|---|---|
| "The Glock 26 with the switch and extended magazine was found exactly where defendant fell into the tall grass, leaving an imprint of his torso and the firearm where his right arm would be." | 3:Trial Tr., at 497 |
| "No one saw him drop the firearm. No one saw him throw the firearm. No one saw him possess the firearm. The defense has tried to hammer that home. But just because you don't see something does not mean it is not proved beyond a reasonable doubt.<br><br>Here's a real simple example. You go to bed at midnight. The streets are clear. Your driveway is clear. You wake up in the morning and it's covered in snow. Proof beyond a reasonable doubt, it snowed last night. You didn't see it snow, but you can say beyond a reasonable doubt it snowed last night. Just because you don't see something happen doesn't mean it didn't happen." | 3:Trial Tr., at 523 |
| "And what does common sense tell you here? What are the chances that the exact spot where Mr. Armstrong ran and fell face-first into the grass, crushing it, you can see the outline, that exact spot is where police recovered a Glock with a switch. What are the chances?" | 3:Trial Tr., at 525 |

In *Parker,* discussed at some length above, this Court rejected a strikingly similar evidentiary presentation and theory of prosecution, suggesting that a jury could return a guilty verdict by dint of mere inference that the defendant possessed the charged firearm discovered "along the path traveled" by a fleeing vehicle in which the defendant had been a passenger. 871 F.3d at 604. This is because there

was no direct observation of the firearm being jettisoned from the vehicle, nor scientific evidence linking the defendant to the firearm thus found "along the path." *Id.* at 602-03. Hence, the thesis was one of mere proximity. *See id.* The firearm may well have been in the street before the flight commenced, for all the trial evidence could say. *Id.* at 604. And "[o]n these facts, assuming the firearm came from [the defendant] is speculative." *Id.*

So too here. The government's mere-proximity evidentiary presentation was one of speculation, rather than direct evidence or even fair inference stemming from circumstantial evidence. And hence was insufficient to satisfy the essential firearm-possession element common to both counts of conviction, such that the convictions must be vacated. The district court cited additional evidence to reach a different conclusion, but as explained next the additional evidence on offer failed to move the government's thesis outside the realm of speculation.

## 2. Absence of Supportive Evidence

As noted earlier, this Court has upheld convictions even though the government presented a proximity thesis in part—which as explained above is categorically insufficient to sustain a conviction standing alone—but only so long as this was buttressed by additional evidence which could directly indicate a nexus-of-possession from the charged firearm to the defendant. *See, e.g., Perez,* 663 F.3d at 392-93; *Parker,* 871 F.3d at 603. In this respect, the district court's order denying a

motion for judgment of acquittal offered several items of proposed additional evidence: (a) flight; (b) presence of crossbody satchel; (c) 2088 Fry landlord prior examination of spot in question; and (d) uncharged "rap video" evidence. (R. Doc. 138, at 2-5; Def. Add., at 73-76). However, these evidentiary items—whether alone or in concert—fail to elevate the government's mere-proximity presentation beyond the speculation threshold:

### (a).    Flight Evidence

This Court has frequently said that evidence of flight is to be treated with caution "because it is often only marginally probative of guilt"; but such evidence may be probative as circumstantial evidence going to consciousness of guilt. *United States v. Chipps,* 410 F.3d 438, 449 (8th Cir. 2005). The probative value of such evidence is to be evaluated based upon whether and to what extent it supports four inferences: (i) that defendant fled; (ii) that said flight evinced consciousness of guilt; (iii) that said guilt related to crime charged in the case; and (iv) that said consciousness of guilt flowed from actual guilt of the crime charged. *Id.* at 449-50.

In this case, one can safely assume inference (i) is supported by the flight evidence presented here, as Mr. Armstrong did flee upon being startled by law enforcement rapidly and aggressively converging upon him in the morning hour. (SOC § C). However, inferences (ii)-(iv) are unsupported by the flight evidence, or at best only weakly so. For the circumstances here offered multiple reasons why Mr.

Armstrong might have fled from law enforcement on October 12, having nothing at all to do with the alleged-but-unobserved possession of a firearm on that date. He was on supervised release. He was subject to active arrest warrants. He possessed contraband marijuana in his crossbody satchel. He was startled by the sudden and overwhelming show of force. (SOC §§ B-C). The list could go on, but the point is clear—the flight evidence presented at trial does not sufficiently bolster the mere-proximity thesis, nor draw a sufficient nexus between Mr. Armstrong and charged firearm. *See, e.g., Parker,* 871 F.3d at 603 (defendant "knew that a warrant for his arrest had been issued for violating supervised release" which could explain his flight, "regardless of any firearm possession"; "Without testimony actually connecting the gun to the fleeing vehicle or to [defendant], the government proof falls short of enabling a jury to make a reasonable inference of possession").

### (b). Crossbody Satchel Evidence

One law enforcement witness asserted the presence of the crossbody satchel on Mr. Armstrong's person at the time of arrest was consistent with a recent "fad," and means by which some arrestees were found to carry a firearm. (1:Trial Tr., at 70-73). This same witness was, of course, compelled to concede that not *all* persons or suspects wearing such a bag had firearms secreted therein. (1:Trial Tr., at 88). And the witness could not say that Mr. Armstrong had done so on October 12, as the witness did not observe Mr. Armstrong reaching into the bag, (1:Trial Tr., at 90-91),

nor possessing or tossing any firearm which had been secreted therein, (1:Trial Tr., at 93). Further, arresting officers did not find the crossbody satchel empty at the time of Mr. Armstrong's arrest, but rather found the bag to contain a smartphone device and quantity of marijuana. (1:Trial Tr., at 93).

Accordingly, the mere fact that Mr. Armstrong was wearing a crossbody satchel at the time of arrest—purportedly of a type that is commonly but not always used to stow firearms—cannot elevate the government's mere-proximity case above the speculative threshold. Even more so than the insufficient flight evidence above, there was simply no "testimony actually connecting the gun" to the crossbody satchel or Mr. Armstrong, and hence "the government proof falls short of enabling a jury to make a reasonable inference of possession." *Parker*, 871 F.3d at 603.

### (c). 2088 Fry Landlord Evidence

The district court cited the testimony of the landlord/owner of the multi-unit property at 2088 Fry, who managed and maintained the property, including the front foliage where the charged firearm was discovered on October 12. (1:Trial Tr., at 184-88). This witness testified that he had seen no firearm within the foliage on the most recent occasion he had been to the property prior to October 12, or any time before that. (1:Trial Tr., at 189-92). However, the landlord did not reside at the 2088 Fry multi-unit building, and the most recent occasion of his presence there prior to

the arrest operation was "at the beginning of the month," perhaps October 1 or 2. (1:Trial Tr., at 197-98).

Hence, even taking the landlord's testimony as showing the charged firearm was not in the 2088 Fry foliage on the date of his most recent visit, the witness was unable to say one way or the other whether the firearm had been placed there in the more-than-one-week period between his prior visit and the October 12 date of arrest. Hence, this testimony "does not preclude the possibility that the gun was already on the ground before" the arrest operation even took place, and for this reason this evidence also fails to draw the required nexus between the charged firearm and Mr. Armstrong's person. *Parker,* 871 F.3d at 604. Again, this leaves only "speculative inferences" to conclude the charged firearm came from Mr. Armstrong, which as already noted is insufficient to support a conviction. *Id.*

### (d). "Rap Video" Evidence

For the last item of proposed supporting evidence, the district court cited uncharged "rap video" evidence offered under FRE 404(b): "[I]n a YouTube video posted less than one month before [Mr.] Armstrong's arrest, [Mr.] Armstrong appeared to have a firearm in the waistband of his pants and rapped about having a Glock with a switch—the same kind of firearm found after [Mr.] Armstrong's fall." (R. Doc. 138, at 5; Def. Add., at 76; *see also* SOC § F.1). However, there are several

analytical problems with the district court's reliance on this uncharged other-acts evidence for the purpose of buttressing the main thesis of mere proximity:

*First,* consistent with the text and purpose of FRE 404(b), the "rap video" evidence was not and could not be offered to prove that Mr. Armstrong had possessed the charged firearm on October 12, based upon the propensity rationale which is expressly forbidden under FRE 404(b)(1). Rather, the government's stated purpose for the evidence was to establish Mr. Armstrong's knowledge of the prohibited characteristics (*i.e.,* automatic-firing capability) of the charged firearm, as well as motive and intent to possess that same firearm, as authorized under FRE 404(b)(2). (R. Doc. 78, at 2-3, 11; MIL Tr., at 21). The "rap video" evidence cannot be used for its forbidden propensity inference to bolster the insufficient mere-proximity main thesis. *See Parker,* 871 F.3d at 603 (defendant's "statement in 2010 that he would carry a gun at all times does not sufficient support an inference that he actually had one on [the date of the alleged unlawful possession]," as this would have the prior statement be used for its forbidden "propensity" inference).

*Second,* the government never claimed nor attempted to prove that the "apparent firearm" depicted in the rap video was an actual firearm, but rather conceded that it might well be a replica or even a "water pistol." (MIL Tr., at 24-25). A government witness conceded that it could be nothing more than replica for

use as a stage "prop." (2:Trial Tr., at 430). Hence, the "rap video" evidence does not even support the forbidden propensity purpose in this case.

In sum, none of the additional evidentiary items relied upon by the district court were sufficient to elevate the government's main mere-proximity thesis beyond the speculation threshold. Hence, the convictions should be vacated as requested next.

### D.    Requested Relief

In *Parker,* which is quite similar to the case at hand, this Court determined the government's mere-proximity thesis was insufficient to sustain the challenged firearm-possession conviction, and hence vacated that same conviction. 871 F.3d at 604. In such situations, the Fifth Amendment Double Jeopardy Clause precludes re-trial. *United States v. Rea,* 300 F.3d 952, 957 (8th Cir. 2002). Hence, Mr. Armstrong respectfully requests that the Court vacate his convictions, and remand with instructions that the district court enter a judgment of acquittal. *United States v. Goodman,* 984 F.2d 235, 240 (8th Cir. 1993).

**II.** **The "rap video" evidence—depicting Mr. Armstrong with an "apparent firearm" tucked in his waistband and offered under FRE 404(b) for the avowed purpose of establishing intent to possess the charged firearm— was of minimal probative value, vastly outweighed by the risk of unfair prejudice such that it should have been excluded under FRE 403.**

In this case the government offered—and the district court admitted over defense objection—certain uncharged other-acts evidence (OAE) under FRE 404(b). (SOC § F). Here, Mr. Armstrong challenges the "rap video" OAE, briefly discussed earlier. (Argument § I.C.2.d). In the context of the government's entire evidentiary presentation, the "rap video" evidence was of marginal probative value, FRE 401, vastly outweighed by its risk and danger of unfair prejudice, such that it should have been excluded under FRE 403.

### A. Standard of Review

Admissibility of the challenged "rap video" evidence was raised for the district court's determination, by both parties and at numerous stages of proceedings. Both parties filed pretrial motions in limine with respect to the challenged "rap video" evidence, with the government advocating for admissibility under FRE 404(b), for the avowed purpose of proving Mr. Armstrong's knowledge of the prohibited characteristics (*i.e.,* automatic-firing capability) of the charged firearm, as well as motive and intent to possess that same firearm. (R. Doc. 78, at 2-3, 11). And Mr. Armstrong arguing that any probative value in the evidence was outweighed by the risk of unfair prejudice. (R. Doc. 74, at 10-11).

The matter was further controverted and argued by the parties in the course of pretrial hearings, consistent with the positions taken in the competing motions in limine. (MIL Tr., at 16-26; R. Doc. 157 (Transcript of 2.13.2023 Pretrial Hearing) (Pretrial Tr.), at 7-8). The district court issued an oral order followed by a written one, permitting the admission of certain portions of the disputed "rap video" evidence. (MIL Tr., at 26-30; Pretrial Tr., at 7-9; R. Doc. 92, at 2, 6; Def. Add., at 66, 70). Including a video clip and still frame, showing what the government described as an "apparent firearm" similar to the charged firearm, and tucked into the waistband of Defendant Armstrong as he performed rap lyrics in a staged production. (Gov. Ex. 34 & 35; MIL Tr., at 23, 25). The same objection was later renewed by defense counsel and overruled by the district court during the course of trial. (2:Trial Tr., at 276-88).

All of this is to say, the challenge to the "rap video" OAE was preserved before the district court. FRE 103(a). And hence this Court reviews the question for abuse of discretion, as evaluated under the criteria below. *United States v. Cotton,* 823 F.3d 430, 433 (8th Cir. 2016).

## B.    Principles of Law

### 1.    Other-Acts Evidence (OAE)

FRE 404(b) *prohibits* evidentiary offers of "any crime, wrong, or act * * * in order to show that on a particular occasion the person acted in accordance," *i.e.,* any

propensity rationale for OAE offered under this rule is prohibited. FRE 404(b)(1). However, such OAE may be admissible if offered for "another purpose," such as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FRE 404(b)(2).

To be admissible under FRE 404(b), the proposed OAE must be: (i) relevant to a material issue raised at trial; (ii) similar in kind and not overly remote in time to the crime charged; (iii) supported by sufficient evidence to support a jury finding the defendant committed the uncharged act; and (iv) exhibit probative value which is not substantially outweighed by its prejudicial effect or other dangers. *United States v. Monds,* 945 F.3d 1049, 1052 (8th Cir. 2019).

At issue here is the fourth and final prong of the above test, which provides that OAE must be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FRE 403. "Unfair prejudice means an undue tendency to suggest decision on an improper basis, including evidence which is so inflammatory on its face as to divert the jury's attention from the material issues in the trial." *United States v. Huyck*, 849 F.3d 432, 440 (8th Cir. 2017) (internal citations and punctuation omitted). Examples include situations where the OAE is weakly supported, heinous, and/or violent. *See, e.g., United States v. Fawbush,* 634 F.3d 420, 423 (8th Cir. 2011); *see also, e.g., United*

*States v. Fortenberry*, 860 F.2d 628, 632-35 (5th Cir. 1988) & *United States v. Gilbert*, 229 F.3d 15, 21-25 (1st Cir. 2000). In applying FRE 403 analysis to proposed OAE, it is particularly important to "discount the value of the disputed evidence if it poses a risk of unfair prejudice and an evidentiary alternative has equal or greater probative value." *United States v. McCourt,* 468 F.3d 1088, 1091 (8th Cir. 2006).

### 2. Rap Video OAE

When it comes to OAE in the form of a "rap video" or "rap lyrics," at issue here, this Court has properly recognized that "danger of unfair prejudice flowing from the lyrics used by * * * rappers * * * which [may be] replete with vulgar, inflammatory, prejudicial language," *e.g.,* "promoting a violent and unlawful lifestyle." *United States v. Moore,* 639 F.3d 443, 448 (8th Cir. 2011) (citation omitted); *see also United States v. Rembert,* 851 F.3d 836, 839-40 (8th Cir. 2017). And any OAE that states or implies the defendant's affiliation or connection with a violent criminal gang is, of course, inherently and highly prejudicial, particularly when having little or no connection to the issues presented at trial. *United States v. Street,* 548 F.3d 618, 629-33 (8th Cir. 2008). One court has recently and aptly observed two guiding principles when considering offers of "rap video" OAE such as at issue here:

First, rap music as genre often glorifies violence, misogyny, crime, and other offensive message which makes its introduction into evidence potentially highly prejudicial. * * * Second, although rap music often contains first-person accounts of the speaker's lifestyle and activities—including criminal activities—the lyrics are not always autobiographical statements. Accounting for this reality * * * not every lyric in a rap video is probative of the charged conduct and [], because the videos pose a great risk of unfair prejudice, it is necessary to distinguish between lyrics with probative value and those without.

*United States v. Wiley,* 610 F.Supp.3d 440, 446 (D. Conn. 2022).

## C.    Application to Instant Case

In the case at hand, the government offered the "rap video" OAE in the form of a video clip and still frame, purporting to reference a Glock firearm with switch add-on, and an "apparent firearm" tucked into the waistband of Mr. Armstrong as he performed those same lyrics. (Gov. Ex. 34 & 35). The government repeatedly asserted that the "rap video" OAE was offered for the "limited purpose" of establishing Mr. Armstrong's mental state with respect to the charged firearm, *i.e.,* motive and intent to possess such a firearm, and knowledge of its prohibited characteristics. (MIL Tr., at 24-26).

However, as described above, the disputed issues in this case had little or nothing to do with Mr. Armstrong's intent and knowledge with respect to possession of the charged firearm, but rather whether he had ever possessed the charged firearm at all. "Evidence of prior acts establishing intent is admissible when a party places

his state of mind at issue, but not admissible when intent is not a serious issue." *United States v. White Plume,* 847 F.3d 624, 629 (8th Cir. 2017) (internal citations and punctuation omitted).

The government's own expert witness testified that anyone familiar with the charged firearm would readily discern its prohibited characteristics. (2:Trial Tr., at 360-61). The truth is, this was not a case where intent was a "serious issue," as it was self-evident that whoever possessed the charged firearm before it was found in the 2088 Fry foliage "intended to do it," and knew of its prohibited characteristics. *White Plume,* 847 F.3d at 629. The real disputed question at trial was who that person was.

Nor can the "rap video" evidence be said to constitute evidence of prior firearm possession, which this Court has generally permitted as OAE in unlawful-firearm-possession cases. *See, e.g., United States v. Harrison,* 70 F.4th 1094, 1097-98 (8th Cir. 2023). For the government expressly made no claim that the "apparent firearm" depicted in the video was an actual firearm, but rather it may have been a "water pistol" for all the government knew or was prepared to prove. (MIL Tr., at 25). A government witness conceded that it could nothing more than replica for use as a stage "prop." (2:Trial Tr., at 430).

In short, the probative value of the "rap video" OAE was miniscule. The risk of unfair prejudice, very high. The video depicts Mr. Armstrong uttering rap lyrics

about Glock firearms equipped with a switch device—just like the charged firearm. These lyrics are uttered as Mr. Armstrong is shown displaying an "apparent firearm," impliedly of the same type as the charged firearm, though as just observed the government was not able or willing to make any such claim. The "rap video" evidence thus carried an extremely high risk of unfair prejudice. And when balanced against the miniscule probative value discussed above, the "rap video" evidence should have been excluded under FRE 403.

The reality is, the jury was apt to consider the "rap video" OAE for its prohibited propensity rationale. That is to say, observing Mr. Armstrong performing rap lyrics expressing ownership of a firearm of the same type as the charged firearm, while displaying an "apparent firearm" which to the untrained eye might even be the charged firearm. And inferring on that basis it was more likely that he had possessed the charged firearm on October 21, 2021. In closing remarks, the government unfortunately espoused and encouraged this very prohibited inference:

> The defendant stated in that video, "Bsco upgraded my Glock. He said I got to switch you up." The defendant's references to "my Glock" and "switch" are not just coincidental, ladies and gentlemen. As the defendant says "my Glock" he lifts his shirt to reveal what appears to be a firearm with extended magazine, putting his words in context. The defendant's acts and words in the rap video show the defendant's knowing possession of the Glock model 26 with a full auto switch.

(3:Trial Tr., at 500).

Nor can this improper "rap video" OAE be pardoned as mere harmless error. As described throughout, the government was unable to muster anything more that a purely circumstantial presentation based upon mere proximity, categorically insufficient to support the convictions standing alone. (Argument § I). There exists a substantial likelihood that the improper "rap video" OAE tipped the scales toward conviction in this case.

### D.     Requested Relief

In sum, in this case the "rap video" OAE was of miniscule probative value, and contained a very high risk of unfair prejudice. The OAE thus should have been excluded under FRE 403. The error cannot be pardoned as harmless, due to that same risk of unfair prejudice and government-encouraged propensity inference. Hence, Mr. Armstrong respectfully requests that the Court reverse the district court's ruling on this subject, vacate his convictions, and remand for new trial. *Fawbush,* 634 F.3d at 423.

## CONCLUSION

For all these reasons, Defendant-Appellant Mr. Armstrong respectfully requests that the Court vacate the district court's judgment as to both counts of conviction, and remand for judgment of acquittal. Or in the alternative, vacate the convictions, and remand the case to the district court for re-trial and/or other appropriate proceedings.

Dated: September 8, 2023       Respectfully submitted,

*s/ Manny K. Atwal*

_____
MANNY K. ATWAL
First Assistant Federal Defender
Eric Riensche
Assistant Federal Defender
District of Minnesota
U.S. Courthouse, Suite 107
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5858

*Counsel for Defendant-Appellant*

In the
United States Court of Appeals
For the Eighth Circuit

United States of America,           )
    Plaintiff-Appellee,           )         **No. 23-2432**
                        )
    vs.           )    **CERTIFICATE OF COMPLIANCE**
                        )
Marques Dwell Armstrong, Jr.,           )
    Defendant-Appellant.           )

1.    This document complies with the type-volume limitation of FRAP 32(a)(7)(B). Excluding the items listed in FRAP 32(f), this brief contains **9,765** words.

2.    This document complies with the typeface requirements of FRAP 32(a)(5) and type-style requirements of FRAP 32(a)(6). This document has been prepared in proportionally spaced typeface, using Microsoft Word, in a 14-point Times New Roman style.

3.    The electronic version of this document has been scanned for viruses, and the scan indicates the electronic version is virus free.

Dated: September 8, 2023        ***s/ Manny K. Atwal***

                                First Assistant Federal Public Defender

In the
United States Court of Appeals
For the Eighth Circuit

| | | |
|---|---|---|
| United States of America, | ) | |
| Plaintiff-Appellee, | ) | **No. 23-2432** |
| | ) | |
| vs. | ) | **CERTIFICATE OF SERVICE** |
| | ) | |
| Marques Dwell Armstrong, Jr., | ) | |
| Defendant-Appellant. | ) | |

I hereby certify that on September 8, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

Marques Dwell Armstrong, Jr.

Dated: September 8, 2023          *s/ Manny K. Atwal*

First Assistant Federal Defender